IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

---------------------------------------------------x

Jennifer Castro and Ariana Clark,

                 Plaintiffs,

       v.

United States of America,

                 Defendant.

---------------------------------------------------x

**COMPLAINT**

Case No.

Plaintiffs, Jennifer Castro and Ariana Clark, by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Untiedt Dabdoub, PLLC, for their Complaint against Defendant as above captioned, bring claims and allege as follows upon information and belief:

**INTRODUCTION**

1.    Lenton Jerome Hatten (hereinafter "Officer Hatten") was a former sports specialist or correctional officer at Federal Correctional Institute, Tallahassee (hereinafter "FCI Tallahassee") who used his position and authority to stalk, sexually abuse, harass, assault, and/or rape at least 11 women who were incarcerated at FCI Tallahassee in the custody of the United States Bureau of Prisons (hereinafter "BOP") while he was employed there. Instead of protecting the women who were

under his care and control, Officer Hatten was allowed and emboldened by the BOP to prey upon them.

2.      Plaintiffs Jennifer Castro (hereinafter "Ms. Castro") and Ariana Clark (hereinafter "Ms. Clark") were respectively, and sometimes together, sexually abused by Officer Hatten while incarcerated at FCI Tallahassee, an all-female, low-security federal prison. Over time, Officer Hatten groomed, manipulated, and coerced the two Plaintiffs into sexual submission, using the power and resources that he had at his disposal as a correctional officer as well as a sports specialist who supervised many prisoners who worked in or for the recreation department (colloquially known as "rec").

3.      Officer Hatten had an apparent *modus operandi* that was known to other BOP staff where he would exploit his power as a correctional officer and isolate himself with female prisoners in areas of FCI Tallahassee that were known to have no security cameras. For instance, as a sports specialist, he was able to, and often did, isolate himself with women in the recreation shack (hereinafter "rec shack"), which is a small shed located in the far back of the recreational yard. There was no security camera inside of the rec shack; there was one at the entrance that would reportedly capture in real time who arrived and left the rec shack, but not what occurred inside. Officer Hatten had a key to the rec shack, and could lock prisoners inside as he desired. Other isolated areas within FCI Tallahassee without security

cameras where Officer Hatten would spend time alone with prisoners included the second floor of a recreational building (which is a separate building from the rec shack, with food services on the first floor), commonly known as "upstairs rec." Even though BOP staff should have noticed Officer Hatten's recurrent behavior of locking prisoners into an enclosed space alone with him, nothing was done to stop his suspicious behavior.

4. Plaintiff Ms. Castro is one of the victims who were sexually abused by Officer Hatten. Ms. Castro has been continuously incarcerated at FCI Tallahassee since in or around 2017, except for an interim period from around April 2021 through around October 2021 when she was incarcerated at Federal Detention Center, Miami (hereinafter "FDC Miami") instead. In or around November 2021, Ms. Castro began to work in the facilities department, which meant that she assisted with repairs throughout FCI Tallahassee. This job often required Ms. Castro to work in the rec shack, which put her in frequent contact with Officer Hatten as her direct supervisor. Within about a month of Ms. Castro joining the facilities department, Officer Hatten initiated sexual contact with her by making inappropriate sexual comments regarding Ms. Castro's body, calling her "White Booty" or "WB." Officer Hatten would publicly call Ms. Castro "WB" in front of other people, with no fear of retribution. Of note, during the first year of her incarceration at FCI Tallahassee in or around 2018, Ms. Castro had been sexually assaulted by a different BOP

employee, Physician Assistant Paul Rolston. Ms. Castro reported this assault while she was in FDC Miami. Upon Ms. Castro's return in or around October 2021, FCI Tallahassee's psychologists confirmed PA Rolston's sexual assault of Ms. Castro and diagnosed her with PTSD. Despite Ms. Castro's known history of sexual victimization by BOP staff, the United States failed to take actions to protect Ms. Castro from further victimization by Officer Hatten.

5.     Ms. Clark was incarcerated at FCI Tallahassee from around January 2020 through around January 2023 when she was released from BOP custody. Ms. Clark identifies as a transgender man and is sexually attracted to women. During their incarceration together, the two Plaintiffs developed a romantic relationship with each other. In or around December 2021, Ms. Clark also began to work in the facilities department. As Ms. Clark and Ms. Castro resided in different housing units, they relied on their job with the facilities department as an opportunity to spend time with each other. Officer Hatten knew this and used his knowledge to manipulate, coerce, abuse, and prey upon both Plaintiffs.

6.     When the Plaintiffs were in the rec shack to do repair work, Officer Hatten would make constant sexual remarks to them like, "You don't know what it's like to be with a real man," or "I'll show you what it's like to have the real thing," referring to his penis. In or around January 2022, Officer Hatten also began to pat,

touch, and/or grope Plaintiffs' buttocks over their clothing whenever he had the opportunity to do so.

7. In or around March 2022, Officer Hatten escalated his abuse by locking the Plaintiffs into the rec shack with him and ordering them to have sex with each other in front of him. Even though the Plaintiffs initially refused to engage in sexual intercourse in front of Officer Hatten, he threatened to separate them and send them to the special housing unit (hereinafter "SHU") if they did not comply. When they still resisted, Officer Hatten grabbed Ms. Castro and pushed them closer together, while once again threatening to "get on the phone" to send them to the SHU if they did not "really get into it." Plaintiffs unwillingly touched each other, while Officer Hatten watched, undressed himself, and masturbated. This incident only ended because, upon information and belief, another person approached the rec shack.

8. Officer Hatten did not stop his pursuit of the Plaintiffs. There were at least three additional incidents over the ensuing months when Officer Hatten isolated the Plaintiffs in the rec shack, locked the door, and forced them to engage in sexual acts with each other while he watched, masturbated, and participated, as further described below. Throughout this time, Officer Hatten also continued to make sexually explicit comments and grope the Plaintiffs over their clothes. He repeatedly locked himself inside the rec shack with the Plaintiffs to spend unsupervised time with them, contrary to the BOP protocols that required at least two officers to be

present to supervise the prisoners working in rec. Even though BOP staff should have noticed Officer Hatten's recurrent behavior of calling prisoners to off-camera areas and spending time with them unsupervised in these secluded areas, nothing was done to stop his suspicious behavior.

9.      Shortly after the first incident in or around March 2022, Officer Hatten again ordered Plaintiffs to return to the rec shack and to have sex with each other in front of him. This time, Officer Hatten touched both Plaintiffs on their breasts and buttocks while exposing his penis and masturbating. He also sexually assaulted Ms. Clark by rubbing his penis on Ms. Clark's face and touching her vagina.

10.      Following this second incident, Officer Hatten began to bring the Plaintiffs some gifts that are valuable in the prison, such as gum, food, makeup, nail polish, soap, and perfume. Other BOP staff, including the Plaintiffs' unit team, with due diligence, should have noticed that the Plaintiffs had access to things that they could only have received from an officer with outside contact. These gifts are considered contrabands that should have been immediately reported and investigated. Upon information and belief, providing contraband to prisoners is a common, predatory tactic used in the context of staff sexual abuse, and is therefore expressly prohibited by the BOP protocols. Without intervention from his colleagues and supervisors, Officer Hatten used his power and authority as a correctional officer to provide the Plaintiffs with contraband, initially as a coercive tactic and later also

for the purpose of extortion. He would threaten or imply that the Plaintiffs would get in trouble if they were to report him or resist him.

11.    During the third incident, between around March 2022 and May 2022, Officer Hatten again isolated the Plaintiffs in the rec shack and ordered them to have sex while he masturbated and touched them. He then said something like, "I want to go," indicating that he also wanted to participate in the sexual activity. Ms. Castro knew that Ms. Clark was terrified of being directly sexually assaulted by Officer Hatten, and she wanted to protect Ms. Clark. Ms. Castro did not see an option other than to "allow" Officer Hatten to assault her. Officer Hatten vaginally raped Ms. Castro on this day, while Ms. Clark was forced to watch without a possibility of escape.

12.    Although he did not rape Ms. Clark during that encounter, Officer Hatten continued harassing and grooming Ms. Clark, with the intent to sexually assault her. On at least one occasion in or around May 2022, Officer Hatten called Ms. Clark to the rec shack alone, showed her his erect penis, and threatened her that if she told anyone, he would have her transferred to the "worst prison" and separated from Ms. Castro. He said he would make her life "hell." Ms. Clark believed him.

13.    Around May or June of 2022, Officer Hatten again called Ms. Castro and Ms. Clark to the rec shack under the guise of doing repair work, and locked them inside with him. This time, after ordering the Plaintiffs to have sex while he exposed

himself and touched them, Officer Hatten turned his attention to Ms. Clark. Ms. Castro again tried to stop him, but Officer Hatten threatened to transfer Ms. Castro to another facility far away from Ms. Clark and Ms. Castro's children. Officer Hatten undressed Ms. Clark, groped her breasts, rubbed his penis against her face and body, and eventually raped her vaginally, while Ms. Castro was forced to watch.

14.    Shortly after this incident, in or around June 2022, Ms. Castro was placed in the SHU after getting a red tattoo with ink that Officer Hatten had given to her. Instead of investigating the source of the tattoo ink, BOP officers penalized Ms. Castro for the tattoo and placed her in the SHU for about a month. Prisoners lose access to the bare modicum of privileges they have, including access to phone, mail, and recreation time, while they are in the SHU. Unfortunately, Officer Hatten continued to make sexual comments to Ms. Castro, calling her "WB," when he would pass by her SHU cell or see her during rec. Officer Hatten was still a rec officer and was not assigned to work in the SHU. Other BOP personnel knew or should have known that Officer Hatten's sudden interest in the SHU and his continued one-on-one interactions with Ms. Castro was highly suspicious, but they did not intervene.

15.    Plaintiffs believe that the reason they did not suffer additional sexual assaults after the fourth incident was because Officer Hatten was repeatedly assaulting another victim, Bonnie Hernandez (hereinafter "Ms. Hernandez").

Shortly after Ms. Castro was released from the SHU in or around July 2022, Officer Hatten decided to resign amid a criminal investigation launched against him when Ms. Hernandez found the courage to report his rape. Officer Hatten's blatant and apparent sexual abuse of Ms. Hernandez, which was widely known throughout the facility and yet condoned until his resignation in August 2022, demonstrated to the Plaintiffs the rape culture at FCI Tallahassee and BOP staff's willful blindness to it.

16.    Officer Hatten's abuse of prisoners was not a secret. Officer Hatten was a boisterous individual, who made inappropriate sexual remarks to prisoners, including the Plaintiffs, loudly and publicly. Officer Hatten's suspicious conduct and preferential treatment towards certain women was a widely known fact throughout FCI Tallahassee. Yet, BOP allowed him to roam the facility with numerous opportunities to isolate, stalk, harass, abuse, and assault women including the Plaintiffs until at least August 2022.

17.    As is common with prison sexual abuse victims, Plaintiffs suffered their sexual abuse in silence, lest they were retaliated against or deprived of the modest privileges they had as incarcerated individuals. Officer Hatten exercised complete dominion and power over them as a correctional officer, as he had the key to their cells and control over their prison jobs, safety, health, welfare, and contact with the outside world. Other BOP officers who knew or should have known about Officer Hatten's sexual abuse permitted, condoned, enabled, or acquiesced to his

misconduct, amplifying the Plaintiffs' fear of retaliation and sense of hopelessness. Plaintiffs only felt comfortable seeking legal counsel and reporting sexual abuse after Officer Hatten stopped working at FCI Tallahassee and Ms. Clark was released from BOP custody.

18.    On April 4, 2023, Officer Hatten was indicted for sexual abuse of one of his other victims, Ms. Hernandez, in violation of 18 U.S.C. § 2243(b). He quickly pled guilty on May 25, 2023, admitting in a statement of facts accompanying his plea agreement that he had engaged in sexual relationship between October 2021 and August 2022 with Ms. Hernandez. He was sentenced to three months of incarceration and five years of supervised release on August 24, 2023. *See United States v. Hatten,* No. 4:23-cr-18 (RH) (MAF) (N.D. Fl.). If the case had proceeded to trial, the Government would have proven beyond a reasonable doubt that Officer Hatten had used FCI Tallahassee as his playground, systematically grooming, manipulating, preying upon, and repeatedly raping Ms. Hernandez.

19.    Prior to Officer Hatten's sentencing on August 24, 2023, the United States had in its possession several other victims' claims of abuse against Officer Hatten including the Plaintiffs' torts claim forms. The extent to which these claims were investigated by the Government is unclear. By counsel, Ms. Castro submitted a victim impact statement to the Government prior to Officer Hatten's sentencing as well. Plaintiffs have not received any follow-up contact or any other update

regarding Officer Hatten to date. He has not been criminally charged with any additional count.

20. The Department of Justice (hereinafter "DOJ")'s refusal to prosecute BOP officers for sexual abuse is a well-known phenomenon. In another federal prison in Florida, Federal Correctional Complex Coleman, there were at least six BOP officers who admitted in sworn statements to have sexually abused at least 10 female prisoners. DOJ's Office of the Inspector General (hereinafter "OIG") declined to investigate or prosecute any of these officers.[1]

21. During relevant times, Officer Hatten's recurrent sexual abuse of incarcerated persons, including the Plaintiffs, was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee. Throughout Officer Hatten's employment at FCI Tallahassee until his resignation in or around August 2022, BOP personnel deliberately ignored alarming warning signs and sex abuse allegations against Officer Hatten.

---

[1] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 3.

22.    It was apparent to Plaintiffs and other victims incarcerated at FCI Tallahassee that BOP personnel would not intervene to prevent Officer Hatten's sexual assaults, let alone adequately discipline, supervise, or reprimand him in accordance with BOP's purported zero-tolerance policy against suspected staff sex abuse on prisoners. Upon information and belief, at least by 2020, BOP employees were aware that Officer Hatten was spending time alone with female prisoners and engaging in inappropriate sexual and/or flirtatious interactions with them. This highly abnormal behavior continued unchecked throughout Officer Hatten's tenure at FCI Tallahassee, with the acquiescence of other BOP officers acting within the course and scope of their employment.

23.    One of the primary reasons Officer Hatten was able to continue abusing so many women for so long, including Plaintiffs, is because his fellow officers did not follow the operating protocols by sharing supervisory duties with him. Upon information and belief, two officers are required to be present during shifts to jointly supervise prisoners who work in or for rec. Therefore, Officer Hatten should never have been alone with prisoners, including the Plaintiffs. However, BOP staff would frequently leave Officer Hatten to supervise prisoners by himself, including behind locked doors and/or during early morning or evening hours. Officer Hatten took advantage of his fellow officers' dereliction of duties to accost, isolate, imprison, harass, abuse, assault, and rape women right under the eyes of the BOP.

24.    Officer Hatten took female prisoners to blind spots within FCI Tallahassee that were not captured by security cameras, contrary to the existing protocols. BOP personnel who were tasked with monitoring security cameras knew that Officer Hatten often interacted with incarcerated persons in these blind spots and stayed there for lengthy periods of time for no apparent reason. There was no intervention to correct this.

25.    Officer Hatten brought contrabands into FCI Tallahassee and used them as part of his *modus operandi* in sexual abuse. He knew and exploited how valuable contrabands are in prison, further trapping his victims financially as well as exposing them to a threat of punishment for possessing contrabands if they were to report him. BOP personnel who were tasked with inspecting prisoners' cells or personal effects, as well as BOP personnel who sent Ms. Castro to the SHU for the tattoo, knew that the Plaintiffs had certain items that must have been brought in from the outside through an officer. There was no intervention to correct or investigate this problem, other than to punish Ms. Castro.

26.    Suspicions and allegations of Officer Hatten's sexual abuse abounded at FCI Tallahassee by the end of 2020, as many BOP employees saw, knew of, and disregarded Officer Hatten's suspicious interactions with incarcerated persons, some of which amounted to flagrant violations of FCI Tallahassee's security or operating protocols. Nevertheless, until August 2022, Officer Hatten continued to work as a

sports specialist and/or correctional officer at FCI Tallahassee with the willful ignorance and tacit approval of his colleagues and/or supervisors, leaving countless victims in his wake, including the Plaintiffs.

27.    It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as the abject systemic failures at FCI Tallahassee and BOP, that Officer Hatten's sexual abuse was able to occur and could continue unabated until August 2022.

28.    As a result of the forementioned deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel as well as systemic failures at FCI Tallahassee, Plaintiffs were forced to engage in recurrent sexual encounters with Officer Hatten by threats of force or coercion. What initially started as grooming and sexual comments eventually developed into assaultive rapes of each Plaintiff in 2022. With the benefit of willful blindness or negligence of his coworkers, Officer Hatten became increasingly aggressive and threatening over time, using FCI Tallahassee as his sexual playground.

29.    As prisoners under Officer Hatten's custodial, supervisory, and disciplinary authority, Plaintiffs did not have a meaningful escape from his predatory conduct. They felt that they had no choice but to comply with Officer Hatten's abuse. They knew that he could take away their privileges, jobs, outside contact, or even put them in the SHU and write them up for disciplinary infractions, thereby

lengthening their prison sentence. They also feared that their reports regarding Officer Hatten would not be believed or taken seriously by the authorities. Indeed, this fear was proven true. Even after Ms. Hernandez took it upon herself to report Officer Hatten, the Government failed to explore the severity, frequency, and magnitude of Officer Hatten's abuse fully or accurately during his criminal proceeding, resulting in a mere 3-month sentence that does not begin to capture the egregious circumstances herein. Moreover, it was widely known among prisoners that after reporting Officer Hatten, Ms. Hernandez was placed in the SHU for "investigation," which further deterred other victims including the Plaintiffs from reporting Officer Hatten.

30.    Plaintiffs Ms. Castro and Ms. Clark each experienced catastrophic and unnecessary pain and suffering because of Defendant's egregious disregard for, and carelessness towards, Plaintiffs' safety and well-being despite the myriad warning signs regarding Officer Hatten's abhorrent conduct.

31.    Plaintiffs bring this suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to them by various BOP personnel within the scope of their employment with the BOP, which in turn resulted in Officer Hatten's recurrent sexual abuse.

32.     Plaintiffs seek redress for Defendant's unlawful conduct, which caused them to suffer permanent and catastrophic injuries.

## JURISDICTION AND VENUE

33.     This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiffs' claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.

34.     This Court has personal jurisdiction because the alleged incidents occurred within the confines of the State of Florida.

35.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the boundaries of this District and Division, in the County of Leon.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

36.     Plaintiffs have properly complied with the requirements of 28 U.S.C. § 2675 by presenting Administrative Claims against the United States of America, which provided the Government with adequate notice regarding Officer Hatten's abusive conduct and other BOP personnel's negligence related thereto. Each

Plaintiff's Claim was timely filed with the BOP on or around June 21, 2023, within two (2) years of the accrual of the causes of action.

37.    On November 1, 2024, the BOP unilaterally denied each of the Plaintiffs' Claims. By filing this action within six months of that denial, each Plaintiff has hereby properly exhausted requisite administrative remedies under 28 U.S.C. §§ 2401(b) and 2675(a). Moreover, this action is timely brought within the statutory time limits provided in 28 U.S.C. §§ 2401(b) and 2675(a).

## PARTIES

### Plaintiffs

38.    At all times relevant hereto, Plaintiff Ms. Castro was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Castro remains incarcerated at FCI Tallahassee.

39.    At all times relevant hereto, Plaintiff Ms. Clark was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Clark was released from FCI Tallahassee in or around January 2023, and currently resides in the State of California.

**Defendant**

40.     Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiffs' claims under the FTCA. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

41.     At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all federal correctional matters including at FCI Tallahassee and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Officer Hatten.

42.     In addition, at all relevant times, Defendant United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

43.     At all times relevant hereto, Defendant United States, acting through the BOP, hired Officer Hatten, as well as his colleagues and supervisors, to serve as "law enforcement officer" within the meaning of 28 U.S.C. § 2680(h).

44.     At all times relevant hereto, Officer Hatten was a sports specialist, recreational officer, correctional officer, and/or an employee of BOP and Defendant

United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Officer Hatten was responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiffs.

45.     At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also employees of BOP and Defendant United States. In their capacity as agents, servants, and employees of Defendant United States, and within the course and scope of their employment as such, these officers were responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiffs.

46.     At all times relevant hereto, Officer Hatten was an agent, representative, or employee of Defendant United States. At all times relevant hereto, Officer Hatten was the authorized agent, servant, or contractor of Defendant United States, acting with the permission, ratification, approval, and consent of Defendant United States.

47.     At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also agents, representatives, or employees of Defendant United States. At all times

relevant hereto, these officers acted within the course and scope of said agency, representation, or employment and were within the scope of their authority, whether actual or apparent. At all times relevant hereto, these officers were the authorized agents, partners, servants, or contractors of Defendant United States, and the acts and omissions herein alleged were done by these officers acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of Defendant United States.

## JURY DEMAND

48.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues and claims in this action that are so triable.

## FACTUAL BACKGROUND

## INDICATIONS AND WARNING SIGNS OF HATTEN'S SEXUAL ABUSE

49.    Plaintiffs hereby repeat, reiterate, and incorporate by reference paragraphs 40 through 47 with the same force and effect as if fully set forth herein.

50.    Congress enacted the Prison Rape Elimination Act (hereinafter "PREA") in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of prisoners. Pursuant to PREA, DOJ promulgated certain regulations, which remain binding on all BOP facilities, including FCI Tallahassee. *See* 28 C.F.R. § 115. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the

following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; "signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a).

51.     In addition, BOP's policies titled "program statements" set forth rules and procedures that all BOP employees were required to follow during relevant time periods:

    a. Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

    b. Program Statement 3420.11 states that BOP employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with prisoners, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

    c. Program Statement 3420.11 goes on to state that "[a]ll allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

d. Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements a zero-tolerance policy toward all forms of staff-on-prisoner sexual abuse, including sexual harassment.

e. Program Statement 5324.12 mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

52. BOP policy requires training of all employees who may have contact with prisoners on how to fulfill their responsibilities under these rules and procedures.

53. Upon information and belief, Officer Hatten's employment at FCI Tallahassee began in or around 2018.

54. Prior to being placed in FCI Tallahassee, Officer Hatten worked at Marianna Camp, another female BOP facility that is located about an hour away from FCI Tallahassee in the State of Florida. Upon information and belief, BOP personnel at Marianna Camp were made aware of Officer Hatten giving commissary items and/or paying for phone minutes for certain women prisoners, which was a warning sign of inappropriate relations with prisoners, in contravention of BOP

protocols. Knowing this, BOP still placed Officer Hatten in FCI Tallahassee, a female facility where he would have access to more victims.

55.    Throughout the time that Officer Hatten worked as a sports specialist and/or correctional officer at FCI Tallahassee, from around 2018 through August 2022, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel. He utilized similar methods to stalk, assault, abuse, and terrorize at least 11 different victims incarcerated at FCI Tallahassee. His routines and *modus operandi* involved flagrant violations of FCI Tallahassee's security and operating protocols, which were and should have been obvious to other BOP personnel.

56.    From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten placing himself in posts where he would be alone and unsupervised with prisoners on their job details. For instance, he volunteered to supervise women working at rec when other officers were not around, and he also frequently worked overtime in food services to supervise women working in the kitchen.

57.    From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and

executive staff, observed Officer Hatten spending substantial amounts of time alone with incarcerated women. They also observed him escorting certain women to various isolated areas within FCI Tallahassee, which were typically "blind spots" that were not captured by security cameras. There was no legitimate explanation as to why Officer Hatten frequently spent time with incarcerated women in these blind spots by himself.

58. Officer Hatten, as a correctional officer, knew how to identify various blind spots that fell outside of the view of the security cameras, such as rec shack, upstairs rec, and the kitchen. He repeatedly took advantage of these known blind spots to brutally abuse his victims, including Plaintiffs, by raping them, forcing them to perform sexual acts, and/or fondling their body. Other BOP officers knew of, and disregarded, Officer Hatten's abnormal behavior of repeatedly isolating himself with certain prisoners and/or locking himself inside enclosed space with certain prisoners.

59. Officer Hatten also abused his authority and flaunted his power by providing his victims with certain benefits or promises of benefits. For example, Officer Hatten frequently brought contraband and gifts to his victims, including Plaintiffs Ms. Castro and Ms. Clark, which was or should have been obvious to other BOP personnel. Had BOP personnel conducted the needed investigations into the benefits that certain prisoners had received from Officer Hatten, they would have

discovered and stopped his sexual abuse before he began to rape and sexually assault the Plaintiffs in 2022.

60. At FCI Tallahassee, Officer Hatten quickly developed a widespread reputation among women prisoners for being a "pervert" who said and did inappropriate things to them. This reputation was well known to other BOP personnel, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff.

61. From 2020 onward, with the COVID-19 pandemic, Officer Hatten's sexual abuse escalated. For social distancing purposes, correctional officers including Officer Hatten were given more power to isolate prisoners and control the prisoners' movements throughout the facility. Officer Hatten used this power to isolate, terrorize, and abuse his victims at his will. In addition, with COVID-19, other officers, particularly those working in rec, were even less likely to oversee or intervene in Officer Hatten's suspicious conduct than before.

62. Upon information and belief, Officer Cornelius Jones ("Officer Jones"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Jones allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves.

Officer Jones knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. He would openly refer to Officer Hatten as a "girl's man" and a "player," acknowledging his sexual behavior. Nonetheless, Officer Jones turned a blind eye and allowed Officer Hatten unfettered access to his victims. Officer Jones himself was verbally abusive to prisoners, calling them "ugly," "fat," "bitch," or sexually degrading terms, supporting his dismissive attitude towards Officer Hatten's sexually abusive conduct.

63.    Upon information and belief, Officer Eric Love ("Officer Love"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Love allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Love knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Upon information and belief, Officer Love had witnessed a prior incident wherein another recreational officer at FCI Tallahassee, Jimmy Highsmith, had sexually abused a woman and was eventually convicted of that crime. Therefore, Officer Love knew or should have known the indications, signs, and concerns of Officer Hatten's

sexually abusive conduct. Nonetheless, Officer Love turned a blind eye and allowed Officer Hatten unfettered access to his victims.

64. Upon information and belief, Officer Larry Mitchell ("Officer Mitchell"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Mitchell allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Mitchell knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Mitchell turned a blind eye and allowed Officer Hatten unfettered access to his victims.

65. Upon information and belief, Officer Nicole Lakoe Jackson ("Officer Jackson"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift and had a close friendship with Hatten. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Jackson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jackson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or

bringing them contraband gifts. In fact, upon information and belief, around October 2021, Officer Jackson made a comment to Ms. Hernandez and another prisoner that, "y'all need to go sit outside with y'all daddy," referring to Officer Hatten. Upon information and belief, there was also a separate incident in 2021 when Warden Erica Strong and Assistant Warden Kimberly Neely reprimanded Officer Hatten and Officer Jackson for allowing certain prisoners to stay in rec during the hours they were not allowed to be there. Despite her apparent awareness of inappropriate relationships between Officer Hatten and certain women, Officer Jackson turned a blind eye and allowed Officer Hatten unfettered access to his victims.

66.   Upon information and belief, Officer Lee Adamson ("Officer Adamson") was the recreation supervisor with authority over Officer Hatten as well as Officers Jones, Love, Mitchell, and Jackson. Instead of monitoring, supervising, and disciplining Officer Hatten pursuant to the BOP protocols, Officer Adamson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Adamson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them gifts. Nonetheless, Officer Adamson turned a blind eye and allowed Officer Hatten unfettered access to his victims. Upon information and belief, Officer Adamson favored Officer Hatten over other recreational officers and condoned his inappropriate behavior, emboldening Officer Hatten to use the prison facility as his

sexual playground. For example, Officer Adamson would give Officer Hatten the first chance at overtime assignments before other recreational officers. In addition, Officer Adamson allowed Officer Hatten to unilaterally re-hire certain women who had previously been fired from the rec jobs, and allowed him to assign them to his own personal crew.

67.    Given the overtness and frequency with which Officer Hatten preyed upon women who were under his custody, other BOP personnel suspected or should have suspected that Officer Hatten was sexually abusing prisoners. Binding PREA regulations mandate staff reporting, whereby all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a). When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is

termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

68.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, and Adamson had numerous opportunities to follow the above-mentioned mandates and stop Officer Hatten's misconduct. Officer Hatten's actions were abnormal, obvious, and suspicious for sexual misconduct. In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. These officers, whose identity is currently unknown to the Plaintiffs, saw or should have seen that Officer Hatten frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer. Nevertheless, BOP personnel took no actions to investigate or stop Officer Hatten's suspicious and recurrent behavior.

69.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, and Adamson failed to investigate, discipline, supervise, monitor, question, or stop Officer Hatten despite numerous indications of sexual misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

70.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, and Adamson, condoned, permitted, acquiesced to, consented to, and tacitly approved Officer Hatten's longstanding abuse of prisoners. Officer Hatten's ongoing abuse of multiple prisoners at FCI Tallahassee was so widely known throughout the prison that the staff turned it into a running joke. Instead of following protocols to protect the prisoners in their care, the prison staff sat around making jokes at their expense. Their actions – and inactions – allowed Officer Hatten to rape and abuse multiple women with impunity.

71.    Before Officer Hatten began to force Ms. Castro and Ms. Clark to engage in sexual acts in or around March 2022, agents, servants, contractors, and employees of BOP, including at least some of the unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee, were aware of suspicions, indications, or concerns regarding Officer Hatten's sexual misconduct. They were aware of Officer Hatten's frequent protocol violations and unexplained suspicious interactions with certain prisoners. Nonetheless, they refused to take the required action to report, monitor, supervise, or investigate Officer Hatten.

72.    It is extraordinary and inexplicable that Defendant United States continued to allow Officer Hatten to spend time alone with female prisoners in isolation, creating daily opportunities for him to commit additional sexual assaults.

73.    The fact that Officer Hatten could get away with sexual abuse while flagrantly violating BOP's policies led his victims, including the Plaintiffs, to believe that he was untouchable. The victims had legitimate concerns that they would suffer retaliation or other substantial harm if they were to report Officer Hatten's assaults. To further fuel this fear, Officer Hatten verbally threatened his victims, including the Plaintiffs, to ensure their silence. He reminded his victims that he had the power to take away their privileges, transfer them to a different facility away from their families, put them in the SHU, or take away their jobs.

74.    BOP personnel at FCI Tallahassee, including lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators, knew Officer Hatten's reputation as a sexual predator. They also knew that female prisoners are reluctant to come forward with information regarding staff sexual abuse for fear of reprisal and loss of work privileges. Despite these known issues, FCI Tallahassee granted Officer Hatten unrestricted and unsupervised contact with numerous women, emboldening him to abuse his position of authority to threaten, violate, and assault his victims.

## HISTORY OF SEXUAL ABUSE AT FCI TALLAHASSEE
## – "DEN OF DESPAIR"

75. FCI Tallahassee has a long and sordid history of sexual abuse within its facility by correctional officers against the prisoners whom they were duty-bound to protect.

76. The facility first gained notoriety in 2006 when there was a shoot-out between a correctional officer and Federal Bureau of Investigation ("FBI") agents that led to the death of two people. In that case, the FBI was present to investigate and arrest six guards for sexually abusing the female prisoners in their custody.[2]

77. FCI Tallahassee has one of the highest rates of staff-on-prisoner abuse complaints in the country, receiving more than 130 complaints since 2012.[3] It is highly likely that the problem is even more widespread than this figure suggests, but that it goes largely unchecked because of cultural tolerance, cover-ups, and organizational reprisals against prisoners who dare to report staff abuse.

78. Physician Assistant Paul Rolston is alleged to have sexually abused numerous women under his care in FCI Tallahassee, including Plaintiff Ms. Castro, beginning in around 2018. Despite several civil complaints filed against PA Rolston, including Ms. Castro's that was settled, instead of firing this serial abuser, FCI

---

[2] *2 federal employees die in Fla. prison shooting*, NBC News, June 21, 2006 at 9:23 AM, https://www.nbcnews.com/id/wbna13415618

[3] Silja J.A. Talvi, *WOMEN REPORT 'RAMPANT' SEXUAL ABUSE AT FEDERAL PRISON WHERE GHISLAINE MAXWELL IS HELD*, The Appeal, Apr 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/

Tallahassee simply transferred him to a male facility, continuing the cycle of silence and abuse at FCI Tallahassee and further perpetuating the environment that protected the abusers at the cost of vulnerable women.[4]

79.    In August 2021, Officer Phillip Golightly was sentenced to 24-months' imprisonment for sexually abusing female prisoners in his care.[5] Even though Officer Golightly was indicted for, and pled guilty to, sexual abuse of only one victim, additional victims who suffered sexual abuse by Officer Golightly were acknowledged as part of the court records.[6] Upon information and belief, Officer Hatten and Officer Golightly, a convicted sexual abuser, were friendly with each other and knew about each other's sexually abusive conduct. In the same way that Officer Hatten summonsed his victims to the isolated rec shack, Officer Golightly called his victims to food services to sexually assault them, even though they did not even work in food services.

80.    In December 2021, another former recreational specialist at FCI Tallahassee, Officer Jimmy Lee Highsmith, was found guilty by a jury of sexually abusing a prisoner.[7] Upon information and belief, numerous complaints were filed

---

[4] *Id.*

[5] *Former Bureau of Prisons Correctional Officer Sentenced to 24 Months In Federal Prison For Sexually Abusing Prisoners*, Press Release U.S. Attorney's Office, Northern District of Florida, Aug. 27, 2021, https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

[6] *Id.*

[7] *Jury Convicts Former Tallahassee Federal Correctional Officer Of Sexual Abuse of Prisoner*, Press Release U.S. Attorney's Office, Northern District of Florida, Dec. 17, 2021,

against Officer Highsmith by women at FCI Tallahassee beginning around 2014, and yet BOP personnel at FCI Tallahassee ignored these complaints to keep him employed as a supervisor for women working in rec—same as in Officer Hatten's case.

81.    These are not the only correctional officers who reportedly sexually abused prisoners at FCI Tallahassee during relevant period. For example, at least one civil lawsuit has been filed against Officer Antoine J. Hand.

82.    There are many similarities in *modus operandi* of Officers Golightly, Highsmith, Hand, and Officer Hatten's sexual abuse, including taking women to off-camera areas by themselves and/or using their jobs as a basis for sexual coercion. Therefore, BOP personnel at FCI Tallahassee, including but not limited to recreational officers, supervisors, executive staff, and investigators, knew or should have known that Officer Hatten's conduct was highly indicative of sexual abuse. Nonetheless, BOP personnel violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

---

https://www.justice.gov/usao-ndfl/pr/jury-convicts-former-tallahassee-federal-correctional-officer-sexual-abuse-inmate.

83.    BOP personnel's reckless disregard of the safety and welfare of victims including the Plaintiffs is highlighted by the fact that multiple correctional officers were sexually assaulting women incarcerated at FCI Tallahassee throughout the relevant times. Officer Hatten fed into, and was also encouraged and enabled by, this toxic culture at FCI Tallahassee.

84.    Despite BOP's purported zero-tolerance policy, sexual abuse of incarcerated people is an issue endemic to BOP, beyond FCI Tallahassee as well. In 2022, the U.S. Senate Permanent Subcommittee on Investigations issued a report (hereinafter "the PSI Report"), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds of federal prisons that have held women (19 out of 29 facilities). The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated people by BOP personnel. The PSI Report specifically found that the United States, through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[8]

85.    Despite this established history of sexual abuse in BOP custody and at FCI Tallahassee specifically, Defendant United States failed to institute a reliable

---

[8] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 4.

practice for detecting and stopping sexual abuse of incarcerated people. As a telling example, FCI Tallahassee's PREA audit reports that were published on or around July 6, 2021, and July 4, 2023, claimed that FCI Tallahassee was compliant with all PREA standards. Even though this audit report was published after PA Rolston and Officers Golightly, Highsmith, and Hatten's sexual abuse became public through criminal investigation, this obvious non-compliance with PREA standards cannot be found anywhere in the reports. This blatant deficiency reflects the culture of Defendant United States of turning a blind eye to sexual abuse of people incarcerated in BOP custody.

86.   Based on the history of sexual abuse at FCI Tallahassee, Defendant United States had actual notice and knowledge that correctional officers could abuse their position of power to sexually assault prisoners, including in off-camera areas.

87.   Nevertheless, Defendant United States failed to take adequate steps to prevent Officer Hatten from engaging in recurrent sexual abuse, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

88.   Upon information and belief, from around August 2019 through July 2022, Officer Hatten sexually abused numerous women in his custody at FCI

Tallahassee. Other than the two Plaintiffs, nine additional women have reported Officer Hatten's abuse to the BOP and/or FBI and other external investigative agencies.

89.    Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FCI Tallahassee before, during, and after Officer Hatten's rapes and abuse of the Plaintiffs.

**OFFICER HATTEN's SEXUAL ABUSE OF PLAINTIFFS**

90.    Emboldened by other BOP personnel's failure to stop him, with increasing fearlessness, Officer Hatten used the tools available to him through the BOP, such as access to prisoners, control over their jobs and livelihood, and blind spots from cameras, to violate and terrorize his victims, including the Plaintiffs.

91.    Ms. Castro first arrived at FCI Tallahassee in or around 2017 at 27 years of age. She remained incarcerated there until around April 2021, when she was briefly transferred to FDC Miami, and again from around October 2021 to the present.

92.    Ms. Clark arrived at FCI Tallahassee in or around January 2020 at 28 years of age. She was continuously incarcerated there until around January 2023, when she was released from BOP custody to a halfway house.

93.    Throughout this time, Ms. Castro and Ms. Clark were respectively under the custodial care, supervision, and control of the agents, servants, employees,

and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as Ms. Castro and Ms. Clark from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

94. Ms. Castro first encountered Officer Hatten towards the end of 2019, when he would work as the officer for the rec yard. She initially did not perceive Officer Hatten as acting inappropriately. However, prior to her early encounters with Officer Hatten, Ms. Castro had experienced sexual abuse from other FCI Tallahassee staff, including PA Rolston, and she was aware of multiple incidents of staff sexual abuse throughout the facility.

95. When Ms. Castro was temporarily housed in FDC Miami, from around April 2021 through October 2021, she felt that she could report PA Rolston's sexual abuse because she was not in FCI Tallahassee, even though the abuse had occurred about three years previously by that time. Upon her return to FCI Tallahassee in or around October 2021, the BOP personnel at the facility, including psychology staff, were made aware of Ms. Castro's report against PA Rolston as well as her ongoing

PTSD diagnosis. BOP staff should have ensured that Ms. Castro received adequate care and treatment, and should have protected her from further assaults from staff members. Instead, BOP failed to protect Ms. Castro, who fell victim to further sexual abuse by Officer Hatten when she was assigned to the facilities department in or around November 2021. Approximately one month later, in or around December 2021, Ms. Clark joined the facilities department as well. Their jobs frequently involved doing repair work in the rec shack, during which Officer Hatten would be their direct supervisor.

96.     Starting in or around mid-2020, using the COVID-19 pandemic to his advantage, Officer Hatten found ways to make sure that he was the only correctional officer escorting certain women to rec, and staying with them in certain locations that he knew were isolated and outside of surveillance camera view. For example, he would take women to the rec shack while other officers were in upstairs rec, and vice versa. This was in violation of the operating protocols under which at least two officers should have supervised women working recreation details at all times. However, none of Officer Hatten's colleagues, including Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson, intervened to stop Officer Hatten's inappropriate conduct.

97.     Upon information and belief, around mid-2020, Officer Hatten began to lock certain women into the rec shack with the intent to abuse them there without

interruption. This *modus operandi* continued undeterred, up to and including his assaults of Ms. Castro and/or Ms. Clark in the rec shack in 2022. There were times when Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson would notice the rec shack door was locked. Even though they knew or should have known that Officer Hatten was there with a prisoner, they took no step to intervene or protect the prisoner.

98.   Officers Jones, Love, Mitchell, Jackson, and Adamson violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

99.   Unaware of Officer Hatten's *modus operandi*, both Plaintiffs began to work in the rec shack whenever there were odd jobs or repair work to be done there. Of note, Ms. Castro and Ms. Clark were involved in exclusive romantic relationship and had what they describe as an "inseparable" bond with each other. However, Ms. Clark was housed in the A unit, and Ms. Castro was housed in the B unit throughout most of the relevant time. Moreover, because of the COVID-19 pandemic,

movements within the facility were often restricted, which meant that prisoners were allowed only limited amount of recreational time per day. Each unit was assigned a particular time of day when they could go outside for recreation. Therefore, the time that the Plaintiffs spent at work became the primary, if not exclusive, source of quality time that they could spend together. Officer Hatten recognized this and used his knowledge about their relationship to entrap, manipulate, coerce, and sexually abuse both Plaintiffs, together and separately.

100.  Shortly after Plaintiffs began to work in the facilities department, Officer Hatten started to act extremely friendly and comfortable with them. He would constantly make sexual comments, like openly calling Ms. Castro "WB," which Plaintiffs knew was a shorthand for "White Booty," telling her to call him "Daddy," or telling Ms. Clark "You've got a nice butt." He showed an increasing level of sexual interest in both Plaintiffs over time, telling them things like, "I can show you what a real man is supposed to do," and "you are too good-looking to waste all of this on a woman." Officer Hatten's remarks were not just sexual harassment, but also targeted, degrading attacks on the Plaintiffs' sexual orientation. Officer Hatten particularly targeted Ms. Clark, who identifies as transgender, asking questions like, "Have you ever been with a man?" and "Have you ever seen a penis?"

101.  Plaintiffs felt extremely uncomfortable with Officer Hatten's increasing harassment, but they tried to shrug off his comments. However, in or around January

2022, Officer Hatten began to physically abuse both Plaintiffs by groping and/or grabbing their buttocks any chance he had when they were working in the rec shack. Officer Hatten began making even more explicit sexual comments, for example asking the Plaintiffs, "What do you all do when you have sex with each other?" Plaintiffs did not want to lose their jobs and/or otherwise be reprimanded for being insolent to an officer, so they tried to treat these comments as jokes. However, Officer Hatten continued to push further, telling them things like, "I am big," and "I bet I can do better," implying that he wanted to have sex with them.

102. Officer Hatten made sure that he was the only correctional officer supervising prisoners working in the rec shack, so that he could spend time alone with his victims, including the Plaintiffs. Indeed, he took every opportunity to spend time alone with the Plaintiffs in the rec shack, behind the locked and/or closed door. This was well outside the normal routine and should have been noticed by other officers, including Officers Adamson, Jones, Mitchell, Love, and Jackson.

103. These BOP officers knew or should have known that Officer Hatten was spending substantial amount of time with Plaintiffs in isolation, outside of security camera view. This was in violation of the BOP protocols requiring at least two officers to supervise prisoners at all times. Yet not a single BOP employee questioned Officer Hatten's interest in the Plaintiffs or their prolonged interactions off camera and behind closed doors.

104.   BOP's inaction emboldened Officer Hatten to take his sexual abuse of the Plaintiffs even further. One day in or around March 2022, Officer Hatten ordered other prisoners in the rec shack to leave, including upon information and belief Ashley Dover, so that only the two Plaintiffs and Officer Hatten remained. Officer Hatten locked the door to the rec shack, and ordered the Plaintiffs to undress and show him "what you all do," meaning that he wanted them to perform sexual acts with each other for his gratification. Plaintiffs tried to brush this off as a joke, but Officer Hatten continued to demand that the Plaintiffs have sex with each other, and he eventually threatened to separate them and/or send them to the SHU if they did not comply with his demand.

105.   Out of fear, Plaintiffs started kissing hesitantly. However, Officer Hatten physically grabbed Ms. Castro and pushed her towards Ms. Clark, again threatening to send them to the SHU if they did not "really get into it." He directed them on how to touch and what to do, and he demanded that they comply or be punished. Ms. Clark was visibly panicked during this incident, and Ms. Castro tried to keep her calm by saying, "It's okay, it's just me and you," and "He's not going to touch us." Even though she was also terrified, Ms. Castro wanted to protect Ms. Clark and to prevent Officer Hatten from sexually assaulting them directly.

106.   Officer Hatten took off his clothes, exposed his penis, and started masturbating while watching the Plaintiffs. Upon information and belief, this

44 of 84

incident was interrupted by someone approaching the rec shack, causing Officer Hatten to get dressed and send the Plaintiffs away.

107.   It did not take long for Officer Hatten to call the Plaintiffs back to the rec shack, ordering them to "finish what you started." Shortly after the first incident, on a day between March 2022 and May 2022, Officer Hatten called the Plaintiffs to the rec shack, under the guise of fixing a cabinet. When they were done with the repair work, Officer Hatten slapped Ms. Castro on the buttocks, complimented her, and said that he wanted to see the Plaintiffs have sex again. Fearful of the consequences if they did not comply with his demands, Plaintiffs undressed and did what they were told.

108.   During this second incident, Officer Hatten touched both Plaintiffs while masturbating himself. He then proceeded to rub his bare genitals against Ms. Clark's face and touch her vagina before ejaculating on the floor. Ms. Clark was shocked, backed into a corner, and started crying inconsolably. Officer Hatten was unable to calm Ms. Clark down to continue with his assault, so he eventually sent the Plaintiffs back to their housing units. After the incident, both Plaintiffs were visibly disturbed, and any reasonable BOP employee knew or should have known from their behavior that something terrible had happened to them. However, neither the correctional officers assigned to the Plaintiffs' housing units nor the facilities

officers who typically monitored the yard reported or investigated the Plaintiffs' unusual demeanors on this day.

109. After this incident, Officer Hatten gifted both Plaintiffs with certain contraband items from the outside, like food, cosmetics, soap, body wash, perfume, and/or tattoo ink. Other BOP staff, including the Plaintiffs' respective unit teams, should have noticed that the Plaintiffs had items that must have been brought in by an officer. This was in contravention of well-established BOP protocols that Officer Hatten had to follow, and should have resulted in separation of Officer Hatten from the Plaintiffs. Instead, BOP continued to give Officer Hatten unfettered access to both Plaintiffs.

110. Officer Hatten constantly sought the Plaintiffs out, ordering both women to report to the rec shack under the guise of making various repairs to the interiors or furniture in the rec shack. The frequency of these repair requests by Officer Hatten was highly unusual, and it was or should have been noticed by other BOP staff including the recreational officers. Officer Hatten had to put in work orders for these repair requests, and Plaintiffs often did not actually complete the requested repair work, so other BOP officers should have found these repair requests suspicious and abnormal. Despite being aware of Officer Hatten's suspicious behavior, his colleagues and supervisors refused to take any action, allowing him to act with impunity.

111. As a result, Officer Hatten continued to take every opportunity to lock the Plaintiffs inside the rec shack with him with an intent to sexually abuse them. During a third incident, which occurred on another day between March 2022 and May 2022, Officer Hatten again ordered the Plaintiffs to report to the rec shack, purportedly to fix a TV stand and/or a shelf. He again made all the other prisoners leave the rec shack, which should have been apparent and alarming to other BOP officers who were nearby, including the recreational officers. Officer Hatten again locked the door to the rec shack, and said something to the effect of, "We are going to have another playdate," as they "hadn't gone all the way" yet. Plaintiffs saw no choice but to engage in sexual acts with each other, while Officer Hatten directed, watched, masturbated, and touched them.

112. This time, Officer Hatten indicated that he wanted to participate in the sexual activity, saying something like, "I want to go." He grabbed Ms. Castro and pulled her close to him. Plaintiffs tried to resist, but Officer Hatten threatened to take away their time together. Officer Hatten placed a chair in the rec shack hallway to block the view from the outside through the window and vaginally raped Ms. Castro, while Ms. Clark was forced to bear witness to it. Upon information and belief, Officer Hatten used a condom, which he later flushed down the toilet in the staff bathroom within the rec shack.

113.    Having gotten what he wanted from Ms. Castro, Officer Hatten acted "nicer" and less overtly aggressive to the Plaintiffs immediately following this third incident. For example, he asked the Plaintiffs to make a list of things that they wanted from "the outside." However, his abusive behavior did not end; he continued to make sexual and/or derogatory remarks to the Plaintiffs whenever he would see them. Even though other BOP officers should have noticed these interactions, no officer reported Officer Hatten's actions or took any steps to stop his abuse.

114.    Officer Hatten continued to accost and sexually harass Ms. Clark whenever he could. On or around Mother's Day in 2022, during an event, Officer Hatten called Ms. Clark into the rec shack by herself, removing her from Ms. Castro's protection. Upon her arrival, despite her obvious discomfort, Officer Hatten made degrading remarks to Ms. Clark about sexual things that he would like to do to her. He then ordered Ms. Clark to come around the side of his desk. When she did, he revealed that he had his pants unzipped and exposed his erect penis to her. He said, "I don't have to touch you, just looking at you makes me a happy man." Before Ms. Clark left the rec shack in panic, Officer Hatten threatened her that he read "all your emails" and watched "all your visits," and that if she were to report him, he would get her "shipped away to the worst prison" far away from Ms. Castro and make her "life hell."

115. The final assault occurred around May or June of 2022. Following his *modus operandi*, Officer Hatten called Ms. Castro and Ms. Clark to the rec shack once again under the pretense of making repairs, locked them inside, and made them perform sexual acts while he exposed himself and touched them. This time, Officer Hatten proceeded to completely undress Ms. Clark despite her obvious discomfort with nudity. He groped Ms. Clark's naked body, rubbed his penis against her face and body, and then donned a condom and vaginally raped her, while he forced Ms. Castro to watch and to touch him.

116. This was the worst assault imaginable to the Plaintiffs, as Ms. Clark is not attracted to men. Ms. Castro again tried to protect Ms. Clark, but Officer Hatten again threatened their relationship, reminding them that he held the power to separate and/or transfer them. He also used the contraband that he had provided them to his advantage, threatening to turn them in and subject them to punishment for possession of unauthorized items.

117. To this day, Plaintiffs experience great agony and distress in speaking about these assaults. Their relationship with each other, as well as their respective mental health, has taken a great toll because of these violent assaults.

118. Following this last assault, from around June 2022 through around July 2022, Ms. Castro was placed in the SHU because it was discovered that she had a new red tattoo. Red ink is not available at FCI Tallahassee, and therefore, it was clear

that she had obtained the ink from BOP staff with outside contact. Instead of investigating the source of the contraband, Ms. Castro's unit team and Lieutenant FNU Taylor, who investigated the incident, merely penalized Ms. Castro for having the tattoo.

119.   The SHU placement gave Officer Hatten a further opportunity to accost and harass Ms. Castro. Even though he was never a SHU officer, Officer Hatten took on additional shifts or overtime at the SHU and left his assigned posts to go to the SHU. He would approach Ms. Castro during rec time and/or in her SHU cell, and make sexually charged comments to her like "WB". When in the SHU, the rec is held in an outdoor cage that is directly across from the rec yard, providing Officer Hatten easy access to Ms. Castro. Officer Hatten also allowed Ms. Clark to see Ms. Castro on the yard, while Ms. Castro was still in the SHU – an unauthorized "favor" meant to buy Plaintiffs' continued silence. Other BOP personnel, including SHU officer at the time, Officer FNU Nettles ("Officer Nettles"), and the facilities officers monitoring the rec yard, knew or should have known about Officer Hatten's suspicious behavior. Nonetheless, no BOP personnel questioned Officer Hatten's interactions with Ms. Castro.

120. Ms. Castro was relieved that Officer Hatten's direct physical interactions with her were limited during her SHU confinement. She also believes that Officer Hatten was focused his attention on one of his other victims, Ms.

Hernandez, during this time, which made him less persistent in his approaches towards the Plaintiffs.

121.   Shortly after Ms. Castro was released from the SHU in or around July 2022, Officer Hatten approached her one last time to tell her that he would be going on vacation, but upon his return, he would call for her to do some repair work again. Fortunately, in or around August 2022, Ms. Hernandez filed a formal report regarding Officer Hatten's rapes. After this, Officer Hatten "resigned" from his employment and did not return to FCI Tallahassee.

122.   In the aftermath of Officer Hatten's abuse, Ms. Castro felt completely unable to trust anyone, especially not any staff at FCI Tallahassee where she remains incarcerated. She has received some outpatient and/or group therapy for trauma. However, she does not find it therapeutic to relive the trauma while she remains trapped at the same facility where she suffered rapes at the hands of an officer who was duty-bound to protect her; and surrounded by the staff who failed to protect her. Ms. Castro remains extremely fearful of reporting her sexual abuse as she is still incarcerated at FCI Tallahassee. Ms. Castro still has years left in her prison sentence, and she does not feel comfortable reporting the sexual abuse that she suffered to FCI Tallahassee staff.

123.   Ms. Clark similarly felt unable to report the sexual abuse that she suffered while she was incarcerated at FCI Tallahassee, because of significant

psychological distress from the sexual assaults as well as the fear of retaliation. Ms. Clark believed that she would be discredited and penalized if she were to report Officer Hatten's abuse to the BOP staff. However, after her release from BOP custody in or around January 2023, Ms. Clark decided to report the abuse through counsel as she wanted to ensure that Ms. Castro would be protected from any further assaults by FCI Tallahassee staff during the remainder of her time there.

124.    In sum, consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Castro and/or Ms. Clark in an off-camera area without interruption. There were no security cameras that captured the inside of the rec shack where the rapes occurred.

125.    Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending time alone and off-camera with Ms. Castro and/or Ms. Clark. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Castro and/or Ms. Clark. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents,

servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

126. Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, and/or Adamson were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Plaintiffs Ms. Castro and Ms. Clark's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep Ms. Castro and/or Ms. Clark safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

127. Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hatten; and his propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring

victims such as Ms. Castro and/or Ms. Clark, demonstrating a plain disregard of an excessive risk to their respective safety and welfare.

128. The repeated horrors that Officer Hatten inflicted on each Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

129. To this day, Ms. Castro continues to suffer profound trauma resulting from Officer Hatten's abuse. Ms. Castro has been diagnosed with complex PTSD, with symptoms of severe anxiety accompanied by panic attacks and intrusive flashbacks of her abuse in addition to ongoing depression and night terrors requiring medications. The rec shack and/or rec yard still serve as a glaring reminder of the abuse that she suffered. Moreover, as is common with survivors of sexual abuse, Ms. Castro places blame on herself for the abuse (including that of Ms. Clark), which amplifies the trauma.

130. Throughout Ms. Castro's ongoing incarceration at FCI Tallahassee, BOP has failed to provide proper counseling or psychological treatment to Ms. Castro, despite PREA and BOP mandates to provide her with such services. See 28 C.F.R. § 115.83.

131. Shortly after Ms. Castro reported the sexual abuse by filing torts claim form through counsel, in or around July 2023, Ms. Castro was compelled to

participate in internal interviews by Special Investigative Agent Regina Eastburn ("SIA Eastburn") and psychology staff at FCI Tallahassee. These interviews were held without an advocate or attorney present, which made Ms. Castro feel extremely uncomfortable and vulnerable. During the interviews with psychology, Ms. Castro confirmed the need for PTSD treatment and counseling, but did not wish to disclose further details.

132.    Ms. Castro was further deterred from reporting her abuse because of FCI Tallahassee's poor reporting and confidentiality protocols. Ms. Castro is aware of other occasions when prisoners were put in the SHU for investigation after reporting an officer's misconduct, for example Ms. Hernandez after reporting Officer Hatten, and another woman after reporting Officer Highsmith. Ms. Castro remains fearful that she would receive the same treatment for reporting on an officer, while she remains incarcerated at FCI Tallahassee.

133.    As a result of the foregoing, Ms. Castro continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Castro also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

134. Upon information and belief, Ms. Castro will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Ms. Castro's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Ms. Castro's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's sexual assaults.

135. To this day, Ms. Clark also continues to suffer from complex PTSD as well as severe and recurrent major depressive disorder. She finds herself feeling angry and disgusted by men around her. For example, despite successfully finding employment after her release from custody, Ms. Clark found herself unable to work with a male boss and quit her job. Ms. Clark suffers from severe interpersonal difficulties, including with friends and family, social withdrawal, suicidal ideation, loss of appetite, and substance dependence. Ms. Clark also experiences severe difficulties with her sexual functioning, including a marked decrease in sexual desire.

136. As a result of the foregoing, Ms. Clark continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of

quality of life. These injuries are expected to be permanent. Ms. Clark also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

137.    Upon information and belief, Ms. Clark will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Ms. Clark's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Ms. Clark's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's sexual assaults.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### NEGLIGENCE CLAIM UNDER FEDERAL TORT CLAIMS ACT
**(Against Defendant United States)**

138.    Plaintiffs hereby repeat, reiterate, and incorporate by reference paragraphs 1 through 137 with the same force and effect as if fully set forth herein.

*United States' liability for the acts and omissions of its employees*

139.    At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Tallahassee, including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, Officer Adamson, as well as Officer Hatten's other colleagues and/or supervisors whose identity is currently

unknown to the Plaintiffs. Within the scope of their employment, these individuals were tasked to and did provide custodial care, control, and supervision to people incarcerated at FCI Tallahassee, including but not limited to the Plaintiffs.

140. At all relevant times, FCI Tallahassee personnel including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and Officer Adamson held themselves out to persons incarcerated at FCI Tallahassee, and in particular to Plaintiffs, as correctional and/or administrative personnel with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

141. At all relevant times, FCI Tallahassee personnel including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, within the scope of their employment with the United States, owed a non-delegable duty of care to each Plaintiff while they were housed at FCI Tallahassee.

142. It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to ensure that correctional and/or administrative personnel with a history of sexual assaults were not allowed to harm or injure other incarcerated people.

143. It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the

scope of their office or employment, to use reasonable care for the safety of incarcerated individuals within their custodies.

144. It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to maintain, operate, and control FCI Tallahassee as a safe and secure space for persons in it, including but not limited to Plaintiffs.

145. It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to provide adequate custody, control, supervision, and monitoring to persons at FCI Tallahassee, including but not limited to Plaintiffs.

146. It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to adequately protect incarcerated people including Plaintiffs from the foreseeable harm inflicted by BOP personnel known to be dangerous, including Officer Hatten.

147. As described in paragraphs 82, 98, and 127, it was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as well as Officer Hatten's other colleagues and supervisors, as federal employees,

while acting within the scope of their office or employment, to ensure that any suspicion or indication of sexual abuse was reported through the chain of command for full investigation. Such suspicion or indication of sexual abuse would include Officer Hatten's suspicious conduct as described in paragraphs 3, 21, 56-58, 71, 96-97, and 102-103; his violation of the operating protocols and/or rules as described in paragraphs 8, 23-26, and 55; and his provision of contraband and/or other benefits to his victims including the Plaintiffs as described in paragraphs 10, 25, 59, and 109.

148.   It was the duty of Officer Adamson and other supervisory officers whose identity is currently unknown to the Plaintiffs, as federal employees, while acting within the scope of their office or employment, to ensure that all BOP employees are trained, supervised, and monitored properly.

149.   As described in paragraphs 3, 68, 87, and 125, it was the duty of certain supervisory and/or administrative staff whose identity is currently unknown to the Plaintiffs, as federal employees, while acting within the scope of their office or employment, to ensure that security cameras are installed, monitored, and attended to throughout FCI Tallahassee, such that sexual assaults described herein would not occur under their watch.

150.   Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, as federal employees and while acting within the scope of their office or employment, breached each of the foregoing duties in paragraphs 139

through 149 that they owed to the Plaintiffs by failing to take adequate steps to protect them from Officer Hatten promptly, despite the numerous warning signs and indications of sexual abuse presented by Officer Hatten. To the extent that any other correctional, supervisory, and/or administrative staff of FCI Tallahassee, such as SHU officers or lieutenants (see paragraphs 14 and 119), Plaintiffs' unit team (see paragraphs 10, 25, 108-109, and 118), facilities or yard officers (see paragraphs 108 and 119), investigators or wardens (see paragraphs 14, 25, 59, and 118), or psychology staff (see paragraph 95), were aware of Officer Hatten's sexually abusive conduct and turned a blind eye to it, they also breached the duties owed to the Plaintiffs by failing to take adequate steps to protect them from Officer Hatten promptly.

151. The breach by federal employees described in paragraph 150 directly exposed each Plaintiff to an unreasonable risk of bodily injury, causing her to fear for her life and safety, and resulted in her being assaulted by Officer Hatten as described above.

152. Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

153.    Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

154.    Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 62, 110-111, 115, and 126, Officer Jones observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

155.    Officer Jones, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

156.    Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his

employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

157. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

158. Officer Jones, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

159. Officer Jones, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

160. In each of the foregoing ways as alleged in paragraphs 152 through 159, Officer Jones did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

161.    In each of the foregoing ways as alleged in paragraphs 152 through 159, Officer Jones, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

162.    In each of the foregoing ways as alleged in paragraphs 152 through 159, Officer Jones, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

163.    Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

164.    Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

165.    Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten.

As described in paragraphs 63, 110-111, 115, and 126, Officer Love observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

166.   Officer Love, as a federal employee and while acting within the scope of his employment, knew that there were prior incidents at FCI Tallahassee where officers sexually abused prisoners with similar *modus operandi* as Officer Hatten's, and yet ignored the blatant suspicions and/or indications of Hatten's sexual abuse.

167.   Officer Love, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

168.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

169.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual

abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

170. Officer Love, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

171. Officer Love, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

172. In each of the foregoing ways as alleged in paragraphs 163 through 171, Officer Love did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

173. In each of the foregoing ways as alleged in paragraphs 163 through 171, Officer Love, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

174. In each of the foregoing ways as alleged in paragraphs 163 through 171, Officer Love, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

175. Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

176. Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

177. Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 64, 110-111, 115, and 126, Officer Mitchell observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

178.  Officer Mitchell, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

179.  Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

180.  Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

181.  Officer Mitchell, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

182.  Officer Mitchell, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise,

investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

183. In each of the foregoing ways as alleged in paragraphs 175 through 182, Officer Mitchell did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

184. In each of the foregoing ways as alleged in paragraphs 175 through 182, Officer Mitchell, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

185. In each of the foregoing ways as alleged in paragraphs 175 through 182, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

186. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

187. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with

him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

188. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 65, 110-111, 115, and 126, Officer Jackson observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that she knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet she did not do so.

189. Officer Jackson, as a federal employee and while acting within the scope of her employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

190. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

191.    Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

192.    Officer Jackson, as a federal employee and while acting within the scope of her employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. She enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

193.    Officer Jackson, as a federal employee and while acting within the scope of her employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

194.    In each of the foregoing ways as alleged in paragraphs 186 through 193, Officer Jackson did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

195.    In each of the foregoing ways as alleged in paragraphs 186 through 193, Officer Jackson, as a federal employee and while acting within the scope of her employment, neglected to apply the skill she did have.

196. In each of the foregoing ways as alleged in paragraphs 186 through 193, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not use reasonable care in applying the skill she had.

197. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

198. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

199. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 66, 110-111, 115, and 126, Officer Adamson observed that Officer Hatten was interacting and meeting with prisoners including

the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

200. Officer Adamson, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

201. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

202. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as Officer Hatten's direct supervisor, allowed him unfettered access to his victims under the pretext of supervising female prisoners working in recreation.

203. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

204. Officer Adamson, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

205. Officer Adamson, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

206. In each of the foregoing ways as alleged in paragraphs 197 through 205, Officer Adamson did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

207. In each of the foregoing ways as alleged in paragraphs 197 through 205, Officer Adamson, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

208. In each of the foregoing ways as alleged in paragraphs 197 through 205, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

209. United States is the sole proper defendant for each breach of duty by federal employees, Officers Jones, Love, Mitchell, Jackson, and/or Adamson alleged

in foregoing paragraphs 141 through 208 under the FTCA. United States is vicariously liable for the acts or omissions of its agents, servants, contractors, and/or employees that occur within the scope of their employment as here.

210. Each Plaintiff's injuries herein were proximately caused by the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of United States' employees including Officers Jones, Love, Mitchell, Jackson, and/or Adamson, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

211. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's employment at FCI Tallahassee was essential to their commission of tortious misconduct, which could not have occurred absent their federal employment and related privileges.

212. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's conduct was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of each Plaintiff.

213. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson were aware of facts that gave rise to an unreasonable risk that each Plaintiff would be irreparably injured.

214. It was foreseeable to Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, based on the facts known to them, that each Plaintiff was at risk of imminent serious harm including sexual abuse.

215. Yet, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson in their official capacities failed and/or refused to prevent the abuse of each Plaintiff or to prevent its psychological consequences from worsening to the extent that they did.

216. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, acting as agents, servants, contractors, and/or employees of the United States, knew that they had an opportunity to intervene and prevent the exacerbation of each Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

217. The failure of FCI Tallahassee personnel, including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, to prevent, investigate, or acknowledge Officer Hatten's sexual abuse of prisoners, including Plaintiffs, served no legitimate policy purpose. On the contrary, FCI Tallahassee staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. The failure to do so by Officer Jones, Officer Love, Officer Mitchell, Officer Jackson,

and/or Officer Adamson, and/or other personnel currently unknown to Plaintiffs, was patently outside of their discretionary function.

*United States' liability for its own acts and omissions*

218. Defendant United States also had independent duty owed to each Plaintiff to adequately protect people incarcerated in its custody and to exercise due diligence in hiring, training, retaining, and supervising its employees.

219. Defendant United States failed abjectly in its duty to detect, prevent, and investigate sexual abuse in its facility (see paragraphs 16, 83-86, and 93), to safeguard its prisoners from its own employees (see paragraphs 4, 15, 22, 50-52, 70, and 72), to protect victims of officer-on-prisoner sexual abuse from retaliation (see paragraphs 73-74 and 123), to provide psychological care and treatment to these victims (see paragraph 130), and to provide a reliable, confidential reporting mechanism (see paragraphs 122 and 132).

220. Defendant United States failed to provide a reasonably safe environment to each Plaintiff, who was under its care, custody, and control without ability to escape.

221. Each Plaintiff's injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28

C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61, Program Statement 5324.12; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a), Program Statement 3420.11; and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

222. Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in improperly hiring, training, retaining, supervising, and/or disciplining Officer Hatten as described in paragraphs 17, 54, and 69.

223. Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in failing to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate with impunity.

224. Defendant United States acted negligently in hiring Officer Hatten, as well as Officers Jones, Love, Mitchell, Jackson, and/or Adamson, who did not

possess the necessary skill to maintain safe and secure environment and protect each Plaintiff from foreseeable harm.

225. Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

226. United States' acts and omissions as described in paragraphs 218 through 224 proximately caused each Plaintiff's injuries.

*Summary*

227. The above-described acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, and the United States constitute the tort of negligence under the laws of the State of Florida.

228. Based on the foregoing circumstances, the United States, if it were a private person, would be liable to each Plaintiff in accordance with the laws of Florida, for the negligence upon each Plaintiff.

229. Each Plaintiff's injuries were inflicted through no fault or want of care or contributory negligence on the part of the Plaintiff.

230. Officer Hatten's rape and sexual abuse of each Plaintiff meets Florida state's requirements for physical impact.

231.    As a direct and proximate result of the foregoing, Plaintiff Ms. Castro and Ms. Clark each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

232.    As a direct and proximate result of the foregoing, Plaintiff Ms. Castro and Ms. Clark has each suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM
### UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

233.    Plaintiffs hereby repeat, reiterate, and incorporate by reference paragraphs 1 through 232 with the same force and effect as if fully set forth herein.

234.    As described in paragraphs 138 through 232, Defendant United States, individually or through Officer Jones, Officer Love, Officer Mitchell, Officer

Jackson, and/or Officer Adamson, in their official roles and capacities as agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to each Plaintiff.

235. The acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, described in paragraphs 138 through 232, constituted extreme and outrageous conduct.

236. Each Plaintiff in fact suffered debilitating emotional suffering.

237. The above-described acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson constitute the tort of negligent infliction of emotional distress under the laws of the State of Florida.

238. Florida state law only recognizes this tort if it meets the requirements under the impact rule, which requires either physical touch or a physical manifestation of emotional distress. The "touch" requirement can be met with a foreign object, such as a gun or by a perpetrator's hands. Therefore, even without a physical manifestation of emotional harm, the Court can make a finding of negligent infliction of emotional distress. *See Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846 (Fla. 2007).

239. Here, Officer Hatten raped and sexually abused each Plaintiff, meeting the requirement of both physical touch and physical manifestation of emotional

distress. Officer Hatten's sexual abuse of each Plaintiff was severe and repetitive, and caused each Plaintiff physical pain and extreme emotional trauma.

240. Under the FTCA, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

241. Based on the foregoing circumstances, the United States, if it were a private person, would be liable to each Plaintiff in accordance with the laws of Florida, for the negligent infliction of emotional distress upon each Plaintiff.

242. As a direct and proximate result of the foregoing, Plaintiff Ms. Castro and Ms. Clark each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

243. As a direct and proximate result of the foregoing, Plaintiff Ms. Castro and Ms. Clark has each suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Jennifer Castro and Ariana Clark respectfully request that judgment be entered against Defendant United States, and that this Court grant the following to each Plaintiff:

1. An award of compensatory damages for all injuries caused by the Defendant, including psychological and personal injuries, pain and suffering, emotional distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, and mental, financial, economic, and reputational damages, both past and future, general and special, and other harm, in an amount to be determined at trial;

2. An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

3. An award of reasonable costs of suit and litigation expenses to the fullest extent permitted by law;

4. An award of reasonable attorneys' fees to the fullest extent permitted by law; together with

5. Such other and further relief at law or in equity as this Court may deem just and proper.

S/ *Jaehyun Oh*
**JAEHYUN OH***
The Jacob D. Fuchsberg Law Firm,
LLP
3 Park Avenue, 37th Floor,
New York, NY 10016
New York Bar No. 5668512
Tel: (212) 869-3500 Ext. 245
j.oh@fuchsberg.com
*Attorney for Plaintiffs*
(* *Pro Hac Vice* Application
Forthcoming)

S/ *Whitney Marie Untiedt*
**WHITNEY MARIE UNTIEDT**
Untiedt Dabdoub, PLLC
1600 Ponce De Leon Blvd., 10th Floor,
Coral Gables, FL 33134
Florida Bar No. 15819
Tel: (305) 330-2397
whitney@udlawyers.com
*Attorney for Plaintiffs*